IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Valerie Ann H.,[1] | ) | C/A No.: 1:22-2297-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated August 12, 2022, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On April 22, 2019, Plaintiff protectively filed an application for DIB in which she alleged her disability began on August 28, 2018. Tr. at 159–62. Her application was denied initially and upon reconsideration. Tr. at 85–88, 92–98. On October 21, 2021, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Julie Petri. Tr. at 32–54 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 29, 2021, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 18, 2022. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 39 years old at the time of the hearing. Tr. at 35. She completed high school. Tr. at 38. Her past relevant work ("PRW") was as a packager. Tr. at 40. She alleges she has been unable to work since August 28, 2018. Tr. at 159.

2.     Medical History

Plaintiff underwent left endoscopic carpal tunnel release ("ECTR") and in situ ulnar nerve neuroplasty at the elbow on October 23, 2015, and right ECTR and in situ ulnar nerve neuroplasty at the elbow on May 26, 2016. Tr. at 399.

Plaintiff presented to the emergency room ("ER") at Newberry County Memorial Hospital ("NCMH") on September 1, 2018, with left upper extremity ("LUE") pain. Tr. at 293. She stated she had been experiencing chronic left shoulder pain since July. *Id.* The attending physician noted tenderness to palpation ("TTP") to the left acromioclavicular ("AC") joint and anterior and lateral shoulder. Tr. at 299. He indicated Plaintiff had full active range of motion ("ROM"), 5/5 grip strength, and normal flexion, extension, abduction, and adduction. Tr. at 298–99. He assessed a left shoulder sprain and administered a Toradol injection. Tr. at 296.

Plaintiff presented to Jacqueline VanDam, M.D., for evaluation of left shoulder pain on August 27, 2018. Tr. at 411. Dr. VanDam observed Plaintiff to have "significant over-reaction maneuvers on exam" and to be "very guarded." Tr. at 412. She reviewed magnetic resonance imaging ("MRI") of Plaintiff's left shoulder and indicated she did not feel there was a correlation between Plaintiff's AC joint arthrosis and her job activity. *Id.*

On September 6, 2018, orthopedist Williams Owens, Jr., M.D. ("Dr. Owens"), observed pain to palpation at the AC joint and the anterolateral aspect of the acromion, as well as some pain through the impingement region with cross-chest adduction. Tr. at 409. He noted forward elevation was limited to about 140 degrees. *Id.* He stated a left shoulder x-ray showed AC arthrosis and type II acromion and a left shoulder MRI showed AC arthrosis, but no full-thickness cuff tear. *Id.* Dr. Owens explained the treatment options, and Plaintiff agreed to proceed with surgery. Tr. at 410. He performed left distal clavicle excision with acromioplasty on October 5, 2018. Tr. at 406.

Plaintiff followed up with Dr. Owens on October 18, 2018. Tr. at 403. Dr. Owens instructed Plaintiff to begin a passive ROM exercise program with therapy. Tr. at 404.

On November 15, 2018, Dr. Owens noted Plaintiff's left shoulder showed "rather profound stiffness after rotation just past neutral and

4

forward elevation [to] about 90 [degrees]." Tr. at 402. He assessed impingement syndrome of the left shoulder and pain in the left shoulder and advised aggressive home and formal physical therapy. *Id.*

On December 2, 2018, Plaintiff presented to the ER at NCMH with left shoulder pain. Tr. at 367. She reported the pain had been ongoing since she underwent surgery in October. *Id.* The attending physician noted tenderness all about the left deltoid and shoulder joint with no edema or erythema. Tr. at 374. He ordered Toradol and Decadron injections, prescribed Naproxen, and instructed Plaintiff to follow up with her orthopedist as soon as possible. Tr. at 370, 374, 375.

On December 4, 2018, Dr. Owens noted Plaintiff's surgical wound had healed nicely and showed no evidence of infection. Tr. at 400. He indicated Plaintiff demonstrated external rotation to neutral and forward elevation to less than 90 degrees. *Id.* He stated Plaintiff had profound stiffness and was making "essentially no progress with therapy." *Id.* He recommended shoulder manipulation and Plaintiff agreed to proceed. *Id.*

Dr. Owens performed left shoulder manipulation under anesthesia on December 10, 2018. Tr. at 397. He was able to achieve full overhead extension and internal and external rotation. *Id.*

On December 20, 2018, Dr. Owens observed external rotation of the left shoulder to 30 degrees and forward elevation to 160 degrees. Tr. at 395. He

indicated Plaintiff had benefitted from manipulation and should continue working with an aggressive therapy protocol. *Id.*

On January 17, 2019, Dr. Owens noted profound stiffness in Plaintiff's left shoulder with external rotation to neutral and elevation to 90 degrees. Tr. at 394. He discussed Plaintiff's treatment options and recommended a second manipulation. *Id.*

Dr. Owens performed left shoulder manipulation under anesthesia on January 25, 2019. Tr. at 392. He was able to achieve full internal and external rotation and full overhead elevation. *Id.* He advised Plaintiff to begin therapy immediately. *Id.*

On February 7, 2019, Dr. Owens encouraged Plaintiff to continue to pursue an aggressive home exercise program and to consider Folk Rehabilitation if she was unable to get back to her previous level of employment. Tr. at 391. He indicated he did not "have anything else to offer" Plaintiff in terms of treatment. *Id.*

Plaintiff presented to orthopedic surgeon Barrett Little, M.D. ("Dr. Little"), for evaluation of left shoulder pain on March 6, 2019. Tr. at 385. She reported difficulty elevating her left shoulder following distal clavicle excision surgery. *Id.* She complained of swelling, but denied numbness and tingling in the left arm. *Id.* Dr. Little recorded normal general exam and right shoulder findings. Tr. at 385–86. On examination of Plaintiff's left shoulder, he noted

6

active forward elevation to 90 degrees, passive forward elevation to 110 degrees, external rotation to 10 degrees, and internal rotation to the abdomen. *Id.* He observed weakness on left rotator cuff testing with pain and positive capsulitis signs. *Id.* He assessed left shoulder adhesive capsulitis and ordered an MRI of the left shoulder. *Id.*

On April 10, 2019, Plaintiff described left shoulder pain over the lateral deltoid that worsened upon reaching. Tr. at 382. She complained of left shoulder stiffness that affected her ability to use her arm for tasks like fixing her hair. *Id.* Dr. Little observed active and passive forward elevation to 105 degrees, external rotation to 10 degrees, and internal rotation to the posterior superior iliac spine ("PSIS"). Tr. at 383. He noted positive capsulitis signs. *Id.* He assessed left shoulder adhesive capsulitis and planned to proceed with left shoulder arthroscopic lysis of adhesions and manipulation under anesthesia. *Id.*

Plaintiff presented to physician assistant Michael Roberts ("PA Roberts") for a preoperative exam on June 17, 2019. Tr. at 415. She rated her pain as an eight on a 10-point scale. *Id.* PA Roberts noted Plaintiff demonstrated active and passive forward elevation to 105 degrees, external rotation with the arm at the side to 10 degrees, and internal rotation to the PSIS. *Id.* He noted no swelling, intact sensation, positive capsulitis signs, and no gross rotator cuff weakness. *Id.* He explained the risks associated with and

alternatives to surgery and noted Plaintiff was anxious to proceed with surgery. Tr. at 415–16.

Dr. Little performed left shoulder manipulation under anesthesia with lysis of adhesion, arthroscopy with debridement, and subacromial decompression on June 27, 2019. Tr. at 439–40.

Plaintiff presented to Progressive Physical Therapy for a shoulder evaluation on July 2, 2019. Tr. at 450. She demonstrated the following ROM: 20 degrees to active flexion; 75 degrees to passive flexion; 45 degrees to passive abduction; 30 degrees to passive external rotation; and 35 degrees to passive internal rotation. *Id.* Physical therapist J. Strickland noted TTP and indicated Plaintiff was very guarded during the evaluation and with active and passive ROM. Tr. at 451. She recommended physical therapy two to three times a week for six to eight weeks. *Id.* Plaintiff attended 40 physical therapy sessions between July 2 and December 19, 2019. Tr. at 478–519.

Plaintiff followed up with PA Roberts on July 12, 2019. Tr. at 452. She rated her pain as an eight and described pain and swelling that extended from the shoulder to the hand. *Id.* PA Roberts observed well-healed arthroscopy portals with no signs of infection. *Id.* He removed Plaintiff's sutures and noted mild left shoulder swelling that extended distally into the hand. *Id.* He stated Plaintiff had capsular signs and persistent stiffness to the shoulder, although her active and passive external rotation had

improved. *Id.* He advised Plaintiff to continue with aggressive therapy and home exercises and to use her shoulder as much as possible to prevent additional scarring and worsening of her adhesive capsulitis. *Id.* He prescribed Indomethacin 50 mg to be taken three times a day over a two-week period. *Id.*

Plaintiff presented to Dr. Little for a six-week post-operative visit on August 16, 2019. Tr. at 461. Dr. Little noted Plaintiff had "made little to no progress from preoperative status" and continued to rate her pain as a nine. *Id.* He noted Plaintiff's passive elevation was no more than 100 degrees, her abduction was a little over 45 degrees, and her external rotation with her arm at her side was to 20 degrees. *Id.* He noted Plaintiff complained of significant pain in all ROM and had significant scapular dyskinesia. *Id.* He assessed left shoulder adhesive capsulitis and ordered shoulder flexion and ice to help improve her ROM. *Id.*

On August 22, 2019, state agency medical consultant Dina Nabors, M.D., assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and frequently reach overhead with the LUE. Tr. at 60–62.

Plaintiff reported doing poorly and rated her left shoulder pain as an eight on October 25, 2019. Tr. at 458. She described continued pain, swelling, and stiffness that extended from her left shoulder to her left hand and worsened with any attempted physical use or movement of her left shoulder and LUE. *Id.* She indicated her symptoms were worse than they had been prior to her initial surgery. *Id.* PA Roberts observed generalized swelling that extended from the left shoulder to the hand and fingers. *Id.* He noted mild skin temperature change with a cooler sensation to the LUE, as compared to the right. *Id.* He stated Plaintiff had significantly decreased ROM throughout the left shoulder with positive capsular signs. *Id.* He was able to passively abduct Plaintiff's left shoulder just past 90 degrees and forward flex her to nearly 100 degrees. *Id.* He stated Plaintiff had significant diminished internal and external rotation, was unable to reach behind her back with her left arm, and had mild rotator cuff weakness. *Id.* PA Roberts administered a cortisone injection and indicated Plaintiff planned to continue with aggressive physical therapy. Tr. at 459. He referred Plaintiff to a pain management specialist for an evaluation for complex regional pain syndrome ("CRPS"). *Id.*

Plaintiff presented to Ratko Vujicic, M.D. ("Dr. Vujicic"), for pain management treatment on November 21, 2019. Tr. at 799. She reported pain in her neck, upper back, left shoulder, left arm, left hand, and all the fingers

of her left hand. *Id.* She described the pain as burning, sharp, and aggravated by anything touching her hand. *Id.* She rated it as a nine. *Id.* Dr. Vujicic observed painful, restricted ROM of Plaintiff's cervical spine due to left paravertebral muscle soreness, mild swelling of her left hand and fingers, diminished bilateral reflexes, diminished strength in the left arm and hand, and allodynia of the left shoulder, arm, hand, and fingers. Tr. at 799–800. He assessed type 1 CRPS of the LUE, left shoulder pain, other chronic pain, long-term use of opiate analgesics, and left arm pain. Tr. at 800. He prescribed two Gabapentin 300 mg capsules three times a day and Tramadol HCl 50 mg three times day. *Id.* He planned to proceed with cervical stellate ganglion blocks on the left. *Id.*

On December 6, 2019, PA Roberts indicated Plaintiff "remain[ed] significantly symptomatic." Tr. at 455. Plaintiff reported no improvement from the intra-articular cortisone injection PA Roberts administered during the prior visit. *Id.* She rated her pain as a nine. *Id.* PA Roberts observed stiffness to the shoulder in all planes that was somewhat improved following the intra-articular cortisone injection, noticeable stiffness to the left arm, apprehensiveness to any attempted ROM, abduction and forward flexion to nearly 110 degrees, active external rotation to 30 degrees, passive external rotation to 45 degrees, and intact sensation. *Id.* He assessed CRPS and chronic adhesive capsulitis and advised Plaintiff to continue with therapy

and treatment with a pain management specialist. Tr. at 455–56. He stated Plaintiff "remain[ed] temporarily disabled from her regular work related duties at th[e] time." Tr. at 456.

Physical therapist Darrell Austin ("PT Austin") provided a progress summary on December 19, 2019. Tr. at 532. He indicated Plaintiff was receiving fair benefit from treatment and had fair compliance. *Id.* He noted Plaintiff described sharp, throbbing, and shooting pain radiating down her LUE that was an eight at best and a nine at present. *Id.* He noted the following passive ROM in the supine position: left shoulder flexion to 140 degrees, abduction to 125 degrees, external rotation to 75 degrees, and internal rotation to 60 degrees. *Id.* He recorded 4/5 left shoulder strength to internal rotation and 4⁻/5 strength to flexion, abduction, extension, external rotation, and extension. *Id.* He stated Plaintiff's strength in scapular stabilizers and rotator cuff muscles was continuing to lag behind and had hindered her LUE function in ranges above 90 degrees elevation. *Id.* He noted Plaintiff continued to be very guarded with passive ROM and continued to report severe pain at times. *Id.* He stated Plaintiff had only partially met goals of treatment. *Id.* He recommended six additional weeks of physical therapy. *Id.* However, on January 7, 2020, PT Austin noted Plaintiff was unable to attend additional physical therapy due to financial concerns. Tr. at 530.

On January 9, 2020, Plaintiff reported she had stopped Tramadol because it caused oversedation. Tr. at 796. She rated her pain as an eight. *Id.* She expressed a desire to hold off on the stellate ganglion blocks. *Id.* Dr. Vujicic observed restricted and painful ROM of the cervical spine due to left paravertebral muscle soreness, mild swelling in the left hand and fingers, diminished strength in the left arm and hand, diminished bilateral reflexes, and allodynia of the left shoulder, arm, hand, and fingers. Tr. at 796–97. He discontinued Tramadol and prescribed Belbuca 75 mcg. Tr. at 797.

On March 2, 2020, Plaintiff indicated two Gabapentin tablets three times a day was minimally effective and Belbuca provided some relief, but was too costly. Tr. at 794. Dr. Vujicic noted left hand edema and mild swelling in Plaintiff's fingers, diminished motor strength in the left arm and hand, diminished reflexes bilaterally, and allodynia of the left shoulder, arm, hand, and fingers. Tr. at 793–94. He discontinued Belbuca and Gabapentin and prescribed Pregabalin 75 mg twice day, Buprenorphine ER 5 mcg/hour, and Lyrica. Tr. at 794.

Plaintiff reported continued left shoulder stiffness and pain on March 13, 2020. Tr. at 692. Dr. Little noted external rotation to 20 degrees, abduction to 50–60 degrees, forward elevation to 95–100 degrees and internal rotation to the iliac crest. *Id.* He assessed left shoulder adhesive capsulitis and CRPS. *Id.* He stated there was nothing more he could offer, as Plaintiff

had exhausted all orthopedic treatment. *Id.* He imposed the following restrictions: "No lifting over 0 pounds above the shoulder level, 5 pounds waist to shoulder and 10 pounds floor to waist. No repetitive work involving use of: left arm. No ladder/stair climbing." Tr. at 696.

Plaintiff presented to pain management physician Christopher Beal, D.O. ("Dr. Beal"), for consultation on July 21, 2020. Tr. at 464. She described constant left-sided neck pain that radiated down her left arm and into her fingers and associated headaches. Tr. at 464, 465. She rated her pain as a nine. Tr. at 465. Dr. Beal observed decreased ROM, tenderness, and bony tenderness to the left shoulder. Tr. at 467. He noted it was difficult to assess muscle strength in Plaintiff's LUE due to give-way weakness and noted decreased sensation to light touch in the entire LUE in a non-dermatomal distribution. *Id.* He stated Plaintiff's pain appeared to be stemming from her left shoulder, as it was reproduced with any movement of the left shoulder. Tr. at 468. He indicated Plaintiff did not have signs of CRPS, as she lacked swelling, temperature change, perspiration change, changes in hair or nails, and changes in color. *Id.* He assessed chronic left shoulder pain and planned to refer Plaintiff to an orthopedist. *Id.* He stated there was no indication for stellate ganglion blocks. *Id.* He ordered x-rays that showed no acute osseous abnormality, unremarkable soft tissues, and mild widening of the left AC joint suggestive of a grade I or II separation. Tr. at 469.

Plaintiff presented to Savonya McAllister, M.D. ("Dr. McAllister"), for a consultative orthopedic exam on September 12, 2020. Tr. at 471. She reported a history of pain and swelling in her left shoulder, arm, and hand that was exacerbated by walking and lying on her left side. *Id.* She indicated she was no longer taking medication or receiving therapy. *Id.* She stated she had difficulty dressing her upper body, could sit for two minutes without difficulty, could stand for two minutes, could walk for two minutes at a normal pace, could lift no weight with her left arm, could lift a gallon of milk with her right arm, could drive, and required assistance from others to perform household chores. Tr. at 471–72. Dr. McAllister noted Plaintiff was 5'5" tall and weighed 221 pounds. Tr. at 472. She recorded normal ROM of the cervical and lumbar spine, right shoulder, right wrist, right elbow, and bilateral hips, knees, and ankles. *Id.* She observed left shoulder abduction to 30/150 degrees, left shoulder adduction to 0/30 degrees, left shoulder forward elevation to 30/150 degrees, left shoulder internal rotation to 10/80 degrees, and left shoulder external rotation to 15/90 degrees on passive testing. Tr. at 472, 475. She indicated Plaintiff had 30/60 degrees of dorsiflexion and 10/60 degrees of palmar flexion in the left wrist. *Id.* Dr. McAllister stated Plaintiff had severe pain during all LUE maneuvers and was unable to move her left arm on her own. Tr. at 472. She noted a normal right hand exam, but decreased grip strength and significant pain with gripping on the left. Tr. at

473. She observed intact fine and gross manipulation and no swelling, deformity, TTP, or loss of range in the left hand. *Id.* She stated Plaintiff "tend[ed] to keep [her] left arm tucked up against her side and either her left arm is hanging or it is in a slightly flexed sling like position." *Id.* She noted Plaintiff demonstrated 3/5 proximal and distal strength, limited by pain. *Id.* She stated Plaintiff had no atrophy and 5/5 right upper extremity and bilateral lower extremity strength. *Id.*

Plaintiff presented to orthopedic physician assistant Elizabeth C. Mitchell ("PA Mitchell") for an initial evaluation on October 30, 2020. Tr. at 576. She described cramping and aching left shoulder pain, weakness, and limited ROM. *Id.* She rated her pain as an eight and noted it was exacerbated by use, weight bearing, and movement. Tr. at 577. PA Mitchell recorded the following on left shoulder exam: no warmth, erythema, or skin changes; no atrophy; diffuse TTP in the bicipital groove, overlying the greater tuberosity, but not over the AC joint; no scapular winging; active and passive forward elevation to 90 degrees; active and passive abduction to 80 degrees; active and passive external rotation to 20 degrees; active and passive internal rotation to the SI joint; 4/5 rotator cuff strength to supraspinatus and internal and external rotation; positive Neer and Hawkins tests; pain elicited with O'Brien's and Speed's testing; and intact motor and sensory exam. Tr. at 578–79. She assessed chronic left shoulder pain due to adhesive capsulitis.

Tr. at 579. She referred Plaintiff to physical therapy and administered a cortisone injection. Tr. at 580.

Plaintiff participated in physical therapy from November 11 to December 4, 2020. Tr. at 697. Physical therapist Kimberly Morin ("PT Morin") noted decreased active ROM of Plaintiff's lumbar spine and left shoulder, impaired postural awareness, increased pain level, decreased bilateral upper extremity strength, impaired LUE sensation to light touch with hypersensitivity, palpable exquisite tenderness of the left cervical and shoulder girdle musculature, and positive Spurling's cervical compression test for reproduction of LUE radiculopathy. *Id.* She noted Plaintiff was responding poorly to therapy and demonstrated regression of functional abilities from 45/80 during the initial evaluation down to 17/80 on December 4, 2020. Tr. at 698.

Plaintiff presented to orthopedic surgeon Justin R. Knight, M.D. ("Dr. Knight"), for evaluation on December 11, 2020. Tr. at 601. She reported no relief from the cortisone injection that PA Mitchell had administered. *Id.* She described numbness that radiated down her left arm and primarily affected her ring and small fingers, as well as pain extending up into her neck. *Id.* She indicated her pain was constant and rated it as a seven. *Id.* Dr. Knight recorded the following: no evidence of sensory loss in the affected area; no warmth, erythema, or skin changes to the LUE; no atrophy to the left

shoulder; diffuse TTP in the bicipital groove, overlying the greater tuberosity, but not over the AC joint; no scapular winging; forward elevation to 90 degrees; abduction to 80 degrees; external rotation to 20 degrees; internal rotation to the SI joint; 4/5 rotator cuff strength; positive Neer and Hawkins tests; pain upon O'Brien's and Speed's tests; intact motor and sensory exams, except for numbness in the ring and small fingers; negative Tinel's signs at the carpal and cubital tunnels; and normal examination of the cervical spine. Tr. at 603–04. Dr. Knight assessed chronic left shoulder pain and adhesive capsulitis. Tr. at 606. He ordered electromyography ("EMG") and nerve conduction studies ("NCS") of the left arm and an MRI of the left shoulder. *Id.*

On December 30, 2020, a second state agency medical consultant, Sannagai Brown, M.D. ("Dr. Brown"), assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand/walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally push and pull with the LUE; frequently crawl; never climb ladders, ropes, or scaffolds; occasionally engage in overhead reaching with the LUE; and frequently perform front and lateral reaching with the LUE. Tr. at 77–79.

On January 4, 2021, Plaintiff described chronic left shoulder and LUE, numbness, and weakness. Tr. at 551. She reported restricted ROM of the left

shoulder and pain and numbness that radiated down her arm and into her hand that mostly affected her first and second fingers. *Id.* William R. Westerkam, M.D. ("Dr. Westerkam"), observed no edema, erythema, or deformities, intact sensation to light touch, no atrophy, and significantly restricted ROM in all planes of the left shoulder. *Id.* He administered NCS and found normal left median, ulnar, and radial sensory nerves. *Id.* He also administered EMG and discovered normal muscles, normal insertional activity, no positive sharp waves or fibrillation potentials, normal motor unit recruitment, normal amplitude, and normal morphology. *Id.* Dr. Westerkam indicated the exam was negative for carpal tunnel syndrome, cubital tunnel syndrome, generalized peripheral polyneuropathy, and cervical radiculopathy. *Id.*

Plaintiff followed up with Dr. Knight on January 7, 2021. Tr. at 622. She reported her symptoms were unchanged. *Id.* Dr. Knight recommended repeat left shoulder arthroscopy and manipulation under anesthesia with lysis of adhesions and ordered physical therapy to commence the day after the procedure. Tr. at 627. He administered a Kefzol injection. *Id.*

Plaintiff presented to Justin Hutcheson, M.D. ("Dr. Hutcheson"), as a new patient for evaluation of chronic widespread pain on May 11, 2021. Tr. at 914. She reported a lengthy history of left shoulder pain and described ongoing pain that radiated into her neck and bilateral upper extremities. *Id.*

She complained of limited ROM, back and neck pain, and stiffness. Tr. at 913. Dr. Hutcheson noted TTP throughout Plaintiff's thoracic and cervical spines, pain with ROM of the thoracic spine in all directions, high pain display, cervical give-way, 5/5 strength, and decreased ROM of the lumbar spine. Tr. at 913–14. He prescribed Cyclobenzaprine and ordered an MRI of the cervical spine and x-rays of the cervical, thoracic, and lumbar spines. Tr. at 914.

Plaintiff rated her pain as an eight on June 17, 2021. Tr. at 906. Dr. Hutcheson observed TTP throughout the thoracic and cervical spines, pain with ROM of the thoracic spine in all directions, high pain display, reduced ROM of the lumbar spine, and 5/5 strength in the lower extremities. Tr. at 909. He reviewed the MRI of Plaintiff's cervical spine and indicated it was unremarkable. Tr. at 909. He noted x-rays of Plaintiff's cervical, thoracic, and lumbar spines were also unremarkable. *Id.* He stated the exam showed bilateral upper extremity give-way and Plaintiff reported pain from her neck to both hands, but noted her "feign[ed] weakness." *Id.*

On June 25, 2021, Dr. Little provided a medical opinion statement. Tr. at 898–99. He stated Plaintiff's conditions included left shoulder arthrofibrosis and LUE CRPS. Tr. at 898. He noted Plaintiff's shoulder was "permanently stiff despite multiple treatments" and "[t]he stiffness [was] associated with pain and limited function." *Id.* He indicated he had observed

lack of ROM and evidence of pain to confirm Plaintiff's diagnosis. Tr. at 899. He stated Plaintiff was taking no medications. *Id.* He noted it was his understanding that Plaintiff's prior job was as a packer for Kraft. *Id.* He stated he believed Plaintiff was disabled from her prior occupation and any occupation for which she was qualified. *Id.*

### C.     The Administrative Proceedings

#### 1.     The Administrative Hearing

##### a.     Plaintiff's Testimony

Plaintiff testified she was 5'5" tall, weighed 215 pounds, and was right-handed. Tr. at 38. She stated she was unmarried and lived with her mother and her 14-year-old daughter. Tr. at 38–39. She indicated her mother used her retirement benefits to cover the household expenses. Tr. at 39. She said she had previously received short- and long-term disability benefits through a private insurer. *Id.*

Plaintiff admitted she had a driver's license. *Id.* She said she experienced swelling in her left arm from her neck to her fingers if she drove for about 20 minutes. Tr. at 40.

Plaintiff confirmed she last worked in August 2018 due to problems with her left shoulder. *Id.* She explained she had worked at Kraft Foods as a packer. *Id.* She described packing and wrapping deli meat that moved on a conveyor belt. *Id.* She stated she lifted a maximum of five pounds. *Id.*

Plaintiff testified she was unable to work because her arm would swell and hurt if she sat or walked for too long. Tr. at 41. She indicated her doctors had recommended neck surgery, but she was not certain whether to pursue it because of its risks. *Id.* She stated she was no longer taking prescription pain medication and was treating her pain with over-the-counter Tylenol and ibuprofen. *Id.* She indicated she had stopped visiting her doctors because they had indicated surgery was her only treatment option and she was uncertain whether she wanted to pursue it. *Id.*

Plaintiff stated she constantly experienced pain in her left shoulder. Tr at 42. She described the pain as radiating into her chest and neck and down her left arm to her fingertips. *Id.*

Plaintiff confirmed that she had previously undergone two surgeries in October 2018 and June 2019 and two manipulations in December 2018 and January 2019. *Id.* She stated none of the procedures had provided relief. *Id.* She indicated she had also received injections and participated in physical therapy without relief. Tr. at 42–43.

Plaintiff stated her left arm was frozen and she could not bend it halfway. Tr. at 43. She said she could only lift her left arm to her bellybutton level. *Id.* She indicated she spent most of a typical day sitting in her bed. *Id.* She testified she would lie down or use ibuprofen, Tylenol, or a heating pad to

reduce swelling. Tr. at 43–44. She said she would typically lie down for no more than an hour per day. Tr. at 44.

Plaintiff stated she was having problems with her right arm for which she had not sought treatment. *Id.* She described popping and pain in her shoulder area and a little difficulty using her right hand. *Id.*

Plaintiff denied cooking and performing household chores. *Id.* She said her mother took care of those tasks. *Id.* She stated her daughter helped her "a little" with dressing. Tr. at 44–45. She said she spent a typical day sitting around, taking to her mother, and walking outside. Tr. at 45. She indicated she could carry nothing with her left hand and approximately five pounds with her right hand. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Renee Smith reviewed the record and testified at the hearing. Tr. at 46–52. The VE categorized Plaintiff's PRW as a packager, *Dictionary of Occupational Titles* ("*DOT*") No. 920.587-018, as requiring medium exertion per the *DOT* and light exertion as performed and a specific vocational preparation ("SVP") of 2. Tr. at 46–47. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that required she never push or pull with the LUE; never climb; frequently crawl; occasionally lift overhead with the LUE; and frequently reach in all other directions. Tr. at 47. The VE testified that the

hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs that the hypothetical person could perform. Tr. at 48. The VE identified light jobs with an SVP of two as a garment sorter, *DOT* No. 222.687-014, a mail sorter, *DOT* No. 222.687-022, and a bagger, *DOT* No. 920.687-018, with 50,000, 140,000, and 13,000 positions in the national economy, respectively. *Id.*

As a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the first question, but to further assume the individual could not lift the left arm above shoulder-level, could lift five pounds from waist to shoulder with the left arm, could lift 10 pounds below waist level with the left arm, and could engage in no repetitive work with the left arm. *Id.* She asked if the individual would be able to perform the jobs previously identified. *Id.* The VE stated the individual would be unable to perform those jobs, but would be able to perform other light jobs with an SVP of 2 as a counter worker, *DOT* No. 249.366-010, a fruit distributor, *DOT* No. 921.685-046, and a laminating-machine offbearer, *DOT* No. 569.686-046, with 80,000, 6,800, and 140,000 positions in the national economy, respectively. Tr. at 49–50.

For a third hypothetical question, the ALJ asked the VE to consider that the individual would be off-task for 15% or more of the workday, in

addition to scheduled breaks. Tr. at 50. She asked if there would be any jobs available. *Id.* The VE stated there would be no jobs. *Id.*

The ALJ asked the VE if her testimony had been consistent with the *DOT* and its companion publications. *Id.* The VE stated her testimony had been consistent with those publications, except certain aspects of her testimony addressed issues not found in the *DOT*. *Id.* She said her testimony as to off-task behavior, reaching, and lifting restrictions affecting the left shoulder was based on her training, education, and experience in the field. Tr. at 51.

Plaintiff's counsel asked the VE to consider the individual described in the first hypothetical question, but to further assume she could never reach with the LUE. *Id.* He asked whether the additional condition would change the VE's response. *Id.* The VE testified the individual could perform the jobs she previously identified, but the number of those jobs would be reduced by 30%. *Id.*

Plaintiff's counsel asked the VE to consider that the individual would be able to do no handling with the LUE. Tr. at 52. The VE testified that she was unaware of any jobs that could be performed with no handling using the LUE. *Id.*

2.     The ALJ's Findings

In her decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2024.

2.     The claimant has not engaged in substantial gainful activity since August 28, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: degenerative joint disease of the left shoulder, complex regional pain syndrome ("CRPS") of the left upper extremity, and obesity (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can never push or pull with the non-dominant left upper extremity. She can never climb. With the non-dominant left upper extremity, she can occasionally reach overhead, but frequently reach in all other directions. With the non-dominant left upper extremity, no lifting over zero pounds above the shoulder level, five pounds waist to shoulder, and ten pounds floor to waist, with no repetitive work involving the use of the left arm.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on January 17, 1982 and was 36 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education (20 CFR 404.1564.

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 28, 2018, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 17–26.

## II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ failed to evaluate CRPS in accordance with SSR 03-2p;

2) the ALJ did not account for Plaintiff's reduced ability to grip with her left hand in the RFC assessment; and

3) the ALJ's appointment was improperly ratified by Nancy Berryhill ("Ms. Berryhill"), whose resumption of the role of Acting Commissioner was not permitted under the Federal Vacancies Reform Act ("FVRA").

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A.   Legal Framework

#### 1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

27

has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that

she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### B.    Analysis

#### 1.    Evaluation of CRPS

SSR 03-2p is a policy interpretation ruling the Social Security Administration ("SSA") directs ALJs to use in cases involving CRPS. It explains that CRPS "is a chronic pain syndrome most often resulting from trauma to a single extremity" and its "most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma." SSR 03-2p, 2003 WL 22399117, at *1. It notes the impairment "may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone." *Id.* SSR 03-2p provides ALJs with specific instructions in evaluating cases involving CRPS.

Plaintiff argues the ALJ failed to evaluate CRPS in accordance with SSR 03-2p. [ECF No. 15 at 14–21]. She maintains the ALJ ignored findings of swelling, allodynia, and skin temperature and color changes that were

consistent with CRPS. *Id.* at 18. She asserts the ALJ erred in discrediting her statements based on normal imaging studies because negative imaging studies do not undermine the CRPS diagnosis. *Id.* at 18–19. She claims the ALJ cherrypicked the evidence in evaluating her complaints. *Id.* at 19–21.

The Commissioner argues the ALJ properly evaluated CRPS of Plaintiff's LUE. [ECF No. 17 at 10–17]. She maintains the ALJ considered CRPS and left shoulder arthritis together because both affected Plaintiff's left shoulder. *Id.* at 11. She asserts the ALJ was not required to cite to SSR 03-2p to comply with its provisions. *Id.* She maintains the ALJ repeatedly addressed Plaintiff's pain, evaluated her statements based on the entire case record, and credited many of her allegations. *Id.* at 11–17.

SSR 03-2p instructs ALJs as follows:

> Given that a variety of symptoms can be associated with . . . CRPS, once the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, and statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. Although symptoms alone cannot be the basis for finding a medically determinable

32

impairment, once the existence of a medically determinable impairment has been established, an individual's symptoms and the effect(s) of those symptoms on the individual's ability to function must be considered both in determining impairment severity and in assessing the individual's residual functional capacity (RFC) as appropriate.

SSR 03-2p, 2003 WL 22814447, at *6.

This language is very similar to that included in SSR 16-3p, which clarifies how the SSA considers the factors in 20 C.F.R. § 404.1529 in evaluating claimants' subjective symptoms. *Compare id.*, *with* SSR 16-3p, 2017 WL 5180304, at *2–3 ("Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability. However, if an individual alleges impairment-related symptoms, we must evaluate those symptoms using a two-step process set forth in our regulations. First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ."), *and* SSR 16-3p, 2017 WL 5180304, at *4 ("Once the existence of a medically determinable impairment that could reasonably be expected to produce pain or other

symptoms is established, we recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.").

In *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017), the court provided additional guidance as to the required analysis under 20 C.F.R. § 404.1529, the regulation addressing how the SSA evaluates symptoms, including pain. The court stated an ALJ "improperly increase[s]" the claimant's "burden of proof" where she requires a claimant's subjective description of symptoms to be verified by objective medical evidence. *Lewis*, 858 F.3d at 866. Thus, if an ALJ concludes a claimant has a severe impairment that could reasonably cause the symptoms she alleges, the ALJ is not permitted to reject the claimant's allegations as to the functional limitations her impairment imposes simply because there are not enough clinical signs and laboratory findings to support the severity she alleges.

However, this does not obligate the ALJ to accept every representation a claimant makes regarding the intensity, persistence, and limiting effects of her symptoms at the second step. The ALJ should consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [the claimant's] history, the signs and laboratory findings, and statements by [the claimant's] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. § 404.1529(c)(4). The ALJ should also consider: (1) the claimant's activities of daily living ("ADLs"); (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

The ALJ must explain which of the claimant's alleged symptoms she found "consistent or inconsistent with the evidence in [the] record and how

[her] evaluation of the individual's symptoms led to [her] conclusions." SSR 16-3p, 2017 WL 5180304, at *8. The explanation requirement imposes a duty on the ALJ to "build an accurate and logical bridge" between the evidence and her conclusions as to the intensity, persistence, and limiting effects of the claimant's symptoms. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Afpel*, 277 F.3d 863, 872 (7th Cir. 2000)).

The ALJ found CRPS of the left upper extremity to be among Plaintiff's severe impairments. Tr. at 17. She determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. at 19. She indicated she considered the entire record in making this assessment. Tr. at 22.

The ALJ's decision contains no reference to SSR 03-2p. However, she specified she had considered Plaintiff's symptoms "based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." Tr. at 19. Because SSRs 03-2p and 16-3p and 20 C.F.R. § 404.1529 require similar evaluation of the claimant's allegations as to symptoms, the court should consider the ALJ's failure to address SSR 03-2p harmless if she complied with the requirements of SSR 16-3p and 20 C.F.R. § 404.1529.

The ALJ wrote:

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because they are not fully supported by or consistent with the longitudinal record. Findings throughout the longitudinal record generally note positive findings of only a decreased range of motion and tenderness of the claimant's left, non-dominant shoulder. Imaging studies note no significant abnormality, other than evidence of the previous distal clavicle excision and findings consistent with adhesive capsulitis. Nerve conduction studies also reported normal results (12F/3, 10–11). Several providers have noted either poor effort, poor therapy tolerance, feigned weakness, guarding, or a high pain display rendering the physical examination unreliable (9F/2, 4; 16F/1; 22F/6; 23F/26). The claimant also reports that she has stopped going to the doctor and is currently only taking over the counter Tylenol and ibuprofen (Hearing Testimony). Additionally, the claimant is still able to participate in activities such as driving a car.

Tr. at 22–23.

Contrary to Plaintiff's assertion, the ALJ considered observations on exam that were consistent with the CRPS diagnosis. She wrote: "In October 2019, findings noted decreased range of motion, generalized swelling of the left shoulder with extension into the hand and digits, and mild skin temperature changes with cooler sensation to the left upper extremity compared to the right side (8F/4)." Tr. at 20. She discussed Dr. Beal's observations of decreased ROM of the left shoulder, give-way weakness, decreased sensation to light touch throughout the LUE in a non-dermatomal distribution, and no "swelling, temperature change, perspiration, changes in hair or nails, or changes in color." Tr. at 21. She noted October and December 2020 observations of "no warmth, erythema, or skin changes." *Id.* She stated

treatment notes from Plaintiff's pain management provider were "in contrast to those in the remainder of the record," as they showed "mild swelling in the left hand and fingers" and "allodynia of the left shoulder, whole arm, hands and fingers." *Id.* The ALJ appropriately credited the differing observations in finding CRPS to be a severe impairment, as SSR 03-2p specifically provides: "It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of . . . CRPS, and do not affect a finding that a medically determinable impairment is present." SSR 03-2p, 2003 WL 22399117, at *4.

The ALJ appropriately considered exam findings and diagnostic studies in evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms, as both SSRs 03-2p and 16-3p require ALJs to evaluate the objective medical evidence in considering the intensity, persistence, and limiting effects of an individual's symptoms. SSR 03-2p explains that "[a]bnormal sympathetic nervous system function" associated with CRPS "may produce changes in blood vessels, skin, musculature and bone." SSR 03-2p, 2003 WL 22399117, at *2. CRPS "results in impaired mobility of the affected region." *Id.* Its clinical progression may be marked by "the manifestation of additional abnormal changes in the skin, nails, muscles, joints, ligaments, and bones of the affected region." *Id.* It recognizes "[t]he

signs and symptoms of . . . CRPS may remain stable over time, improve, or worsen" and that "[d]ocumentation should . . . include a longitudinal clinical record containing detailed medical observations, treatment, the individual's response to treatment, complications of treatment, and a detailed description of how the impairment limits the individual's ability to function and perform or sustain work activity over time." *Id.* at *5. In accordance with the SSRs, the ALJ appropriately cited evidence that suggested the absence of progression of CRPS, including clinical observations of mostly stable or absent signs, imaging studies that showed no bone progression, and NCS that indicated no atrophy.

The ALJ also appropriately considered the medical providers' observations as to Plaintiff's pain-related behavior. Pursuant to 20 C.F.R. § 404.1529(c)(4), the ALJ should consider the claimant's providers' impressions as to how her symptoms affect her. SSR 03-2p provides that "[o]pinions from an individual's medical sources, especially treating sources, concerning the effect(s) of . . . CRPS on the individual's ability to function in a sustained manner . . . are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC." *Id.* at *7. The ALJ cited to Dr. Beal's indication that it was "difficult to assess motor strength in the left upper extremity in [a] setting of giveaway weakness" and that he "d[id] not agree with the diagnosis of [CRPS] given she has no signs."

Tr. at 23 (referencing Tr. at 467, 468). She noted PT Morin's impression that Plaintiff had "poor therapy tolerance" and endorsed "worsening of symptoms even with the most conservative therapy treatment." *Id.* (citing Tr. at 697). She referenced Dr. Hutcheson's indication the exam showed "bue giveway, pt notes pain from neck to both hands, given exam where pt feigns weakness, need xray/mri to assess further." *Id.* (citing Tr. at 909). She referred to Dr. Hutcheson's additional impression that he was "[n]ot clear on patient motivations due to her failure to follow up with treating physicians despite complaining of longstanding pain" and his observations that "[s]he had high pain display on exam along with giveway so this made physical exam today unreliable"). *Id.* (citing Tr. at 945). The ALJ found persuasive and credited in the RFC assessment the specific functional limitations Dr. Little provided as to Plaintiff's ability to use her LUE. *See* Tr. at 23.

Although the ALJ cited numerous valid reasons to support her finding that Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were inconsistent with the record, the court is constrained to find her evaluation was incomplete. The ALJ did not err in considering Plaintiff's testimony that she was no longer seeing doctors and was taking only over-the-counter medication, Tr. at 23, as an ALJ may find inconsistency between a claimant's statements as to the intensity, persistence, and limiting effects of her symptoms if the frequency or extent of

40

the treatment she seeks is not comparable to her complaints. SSR 16-3p, 2017 WL 5180304, *9–*10. However, ALJs are required to "consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities." *Id.* at *9. "Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." *Id.* As the ALJ's summary reflects, Plaintiff repeatedly sought treatment for her symptoms through various specialists and procedures, including two surgeries, manipulations under anesthesia, injections, and physical therapy. *See generally* Tr. at 20–22.

Here, the ALJ failed to reconcile Plaintiff's indication that she had stopped seeing her providers because they could offer nothing other than additional surgery, which she was uncertain whether to pursue. An ALJ "will not find an individual's symptoms inconsistent with the evidence in the record" because "the frequency or extent of the treatment sought" by that individual is "not comparable with the degree of [her] subjective complaints" unless she also "consider[s] possible reasons [the individual] may not comply with treatment or seek treatment consistent with the degree of . . . her

41

complaints." SSR 16-3p, 2017 WL 5180304, at *9. The ALJ erred to the extent that she discounted Plaintiff's statements as to her pain and other symptoms based on her failure to pursue additional treatment without also considering her reasons for declining to do so.

In addressing Plaintiff's statements describing her pain and other symptoms, the ALJ wrote only the following:

> She reports symptoms of pain and swelling in her left shoulder as well as numbness in her left arm and hand (Hearing Testimony; 15E). She also reports medication side effects of drowsiness, dizziness, and blurred vision (7E/2). The claimant has alleged that her impairments affect her ability to lift, reach, and use her left hand and arm.

Tr. at 19. She did not acknowledge how Plaintiff indicated her impairments affected those abilities. *See generally* Tr. at 19–24. Her decision does not comply with the applicable regulation and SSR because it lacks discussion of Plaintiff's statements as to the frequency and duration of her symptoms, their effect on her ability to perform ADLs, and factors that precipitate or aggravate them. *See* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

The record reflects Plaintiff's consistent reports of pain. Throughout the relevant period, she rated her pain between a seven and a nine. *See, e.g.*, Tr. at 415, 452, 458, 465, 577, 601, 799, 906. She provided specific descriptions of her pain and related symptoms. *See, e.g.*, Tr. at 214–16 (reflecting responses to a pain questionnaire), 458 (reporting pain, swelling, and stiffness that

extended from her left shoulder to her left hand and worsened with any attempted physical use or movement of her left shoulder and LUE), 464 (describing constant left-sided neck pain that radiated down her left arm and into her fingers), 551 (complaining of chronic left shoulder and LUE pain, numbness, and weakness, and restricted ROM of the left shoulder), 799 (indicating burning, sharp pain in her neck, upper back, left shoulder, left arm, left hand, and all the fingers of her left hand that was aggravated by anything touching her hand). She indicated her pain and related symptoms prevented her from maintaining her hair and assisting with her daughter's hair, walking for long periods, and performing household chores. Tr. at 44, 215. She said she required some assistance to dress herself. Tr. at 44–45.

A claimant's ADLs are particularly relevant to evaluation of the intensity and persistence of her symptoms. 20 C.F.R. § 404.1529. The ALJ generally neglected Plaintiff's testimony as to her limited ability to perform ADLs—only addressing her ability to drive. *See generally* Tr. at 19–24. "An ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *see also Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 99 (4th Cir. 2020) (finding the ALJ erred in improperly disregarding the claimant's qualifying statements regarding the limited extent to which she could perform ADLs). The ALJ

considered Plaintiff's ability to drive out of context, as she failed to address Plaintiff's reports that she could only drive with her right hand and experienced swelling in her left arm from her neck to her fingers after driving for about 20 minutes. *See* Tr. at 40, 216.

Because the ALJ's evaluation of Plaintiff's statements as to the intensity, persistence, and limiting effects of CRPS fails to comply with the requirements of 20 C.F.R. § 404.1529 and SSRs 03-2p and 16-3p, she failed to build the accurate and logical bridge to sustain her conclusion.

### 2. Ability to Use Left Hand

Plaintiff argues the ALJ failed to adequately consider her ability to use her left hand in assessing her RFC. [ECF No. 15 at 21–26]. She maintains the ALJ did not reconcile evidence of her limited ability to use her left hand with her decision not to include a restriction in the RFC assessment. *Id.* at 22–23. She contends the ALJ failed to question the VE as to the job-related implications of an individual's limited ability to use a hand. *Id.* at 26–32.

The Commissioner argues the ALJ performed a function-by-function analysis and specifically considered Plaintiff's ability to use her LUE, including her hand. [ECF No. 17 at 17]. She submits Plaintiff claimed in her application that she had difficulty using her left arm, not her left hand, but maintains the ALJ included restrictions related to the functionality of Plaintiff's left hand in the RFC assessment. *Id.* She contends the ALJ cited

the relevant evidence and was not required to accept all of Plaintiff's complaints. *Id.* at 19.

A claimant's RFC should be based on all the relevant evidence in the record. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ "must consider all allegations of physical and mental limitations or restrictions." *Id.* at *5. The ALJ must identify the claimant's functional limitations and restrictions and assess her remaining capacities for work-related activities. SSR 96-8p, 1996 WL 374184, at *2. She must be mindful of the claimant's ability to meet the physical, mental, sensory, and other requirements of work on a regular and continuing basis, "mean[ing] 8 hours a day, for five days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2, *7; *see also* 20 C.F.R. § 404.1545(a) (4), (b).

"The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (citing *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989)). This requires the ALJ to provide a narrative discussion of the restrictions included in the RFC assessment that references specific medical facts, such as medical signs and laboratory evidence, and non-medical evidence, including daily activities and observations, and "explain[s] how any material inconsistencies or ambiguities in the case record were considered and resolved." SSR 96-8p,

1996 WL 374184, at *7. "The RFC assessment must include a discussion of why symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).

The regulations specify: "We will . . . consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you . . . or other persons." 20 C.F.R. § 404.1545(a)(3). Plaintiff described her pain as affecting her left hand and fingers and exacerbated by contact, use, and movement. *See, e.g.,* Tr. at 458, 471, 551, 799, 909. Several treating and consultative medical providers observed Plaintiff to demonstrate decreased strength, allodynia, swelling, diminished reflexes, and deceased sensation in her left hand and fingers. *See. e.g.,* Tr. at 452, 458, 473, 793–94, 796–97, 799–800.

The ALJ included restrictions in the RFC assessment limiting Plaintiff's abilities to push, pull, reach, and lift with the LUE and indicating she could not perform repetitive work with the left arm. *See* Tr. at 18–19. In explaining the RFC assessment, the ALJ referenced Plaintiff's complaints of

problems specifically pertaining to her left hand, including reports of limited use and numbness radiating down her left arm and affecting her small and ring fingers. Tr. at 19–21. She cited Plaintiff's providers' observations of swelling in her left hand and fingers, allodynia of the left hand and fingers, diminished motor strength in the left hand, decreased ROM of the left wrist, decreased grip strength, and pain with gripping. Tr. at 20–22. However, despite having acknowledged Plaintiff's allegations and the aforementioned evidence, the ALJ did not specifically address Plaintiff's ability to use her left hand for handling and fingering.

The ALJ was not required to include any specific restrictions, but she was required to resolve the conflicting evidence as to Plaintiff's ability to use her left hand for manipulative functions. The regulations recognize lifting, carrying, pushing, pulling, reaching, and handling are distinct physical functions. *See* 20 C.F.R. § 404.1545(b); *see also* SSR 96-8p, 1996 WL 374184, at *5–6 (noting lifting, carrying, pushing, and pulling are strength demands that pertain to an individual's exertional capacity and that reaching and handling are manipulative activities that pertain to an individual's nonexertional capacity and that each must be "expressed in terms of work-related functions").

Review of the VE's testimony also distinguishes these functions. The VE testified the individual described in the ALJ's hypothetical question

mirroring the RFC assessment could perform jobs as a counter worker, a fruit distributor, and a laminating-machine offbearer. Tr. at 49–50. A review of the *DOT*'s descriptions of these jobs shows they required at least occasional handling. *See* 249.366-010, COUNTER CLERK. *DOT* (4th Ed., revised 1991), 1991 WL 672323; 921.685-046, FRUIT DISTRIBUTOR. *DOT* (4th Ed., revised 1991), 1991 WL 688088; 569.686-046, LAMINATING-MACHINE OFFBEARER. *DOT* (4th Ed., revised 1991), 1991 WL 683893. The VE further testified an individual would be unable to perform any jobs if she could not handle with the left, nondominant hand, Tr. at 52.

Because the ALJ did not address the specific handling function, the court cannot find her hypothetical question to the VE and the resulting RFC assessment adequately resolved the evidence as to Plaintiff's ability to use her left hand to perform work-related functions. Further, in the absence of a specific explanation for declining to include restrictions as to use of the left hand, the court cannot interpret the ALJ's silence as indicative of a finding that no such limitations existed. Therefore, this is a case in which the ALJ's failure to include specific restrictions, despite contradictory evidence in the record, necessitates remand. *See Mascio*, 780 F.3d at 636.

3.    Challenge to ALJ Appointment

In *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 292–93 (2017), the Court explained:

Article II of the Constitution requires that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." § 2, cl. 2. Given this provision, the responsibilities of an office requiring Presidential appointment and Senate confirmation—known as a "PAS" office—may go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement. Congress has long accounted for this reality by authorizing the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation.

The Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3345 et seq., is the latest version of that authorization. Section 3345(a) of the FVRA authorizes three classes of Government officials to become acting officers. The general rule is that the first assistant to a vacant office shall become the acting officer. The President may override that default rule by directing either a person serving in a different PAS office or a senior employee within the relevant agency to become the acting officer instead.

"In December 2016, President Barack Obama issued a memorandum providing an order of succession with the [SSA], that listed the Deputy Commissioner of Operations ("DCO") as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner." *Brooks v. Kijakazi*, 2022 WL 2834345, at *14 (M.D.N.C. July 20, 2022). Consequently, Ms. Berryhill, who had been serving as the DCO, began serving as Acting Commissioner upon the resignation of the Commissioner and Deputy Commissioner on January 21, 2017. *Id.* She served as Acting Commissioner until November 16, 2017, when the initial 210-day period for acting service expired pursuant to 5 U.S.C. § 3346(a)(1). *Williams v. Kijakazi*, C/A No. 1:21-141-GCM, 2022 WL 2163008, at *2

(W.D.N.C. June 15, 2022). Ms. Berryhill continued to serve in the role as DCO until April 17, 2018, when she again assumed the role of Acting Commissioner upon President Trump's nomination of Andrew Saul ("Mr. Saul") as Commissioner. *Id.* On July 16, 2018, Ms. Berryhill ratified the appointments of all the SSA ALJs in response to the Supreme Court's decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018), holding that SEC ALJs were Officers of United States, as opposed to merely employees, and that their appointments by lower-level staff of the Securities and Exchange Commission violated the Appointments Clause.[4] *Id.; see also Brian T.D. v. Kijakazi*, 580 F. Supp. 3d 615, 621 (D. Minn. 2022).

Plaintiff argues Ms. Berryhill's 2018 ratification of the ALJs' appointments was ineffective because the FVRA did not permit her to resume the role of Acting Commissioner after she completed the initial 210-day period during which she could serve in the role. [ECF No. 15 at 21–32]. She maintains Ms. Berryhill was not permitted to resume the role of Acting Commissioner after a nomination was submitted to the Senate because she was not serving as Acting Commissioner at that time. *Id.* at 27. She contends that Ms. Berryhill's ratification of the ALJ's appointment has no force or effect because she lacked authority to appoint ALJs. *Id.* at 31–32.

---

[4] "Prior to *Lucia*, SSA ALJs, like their SEC counterparts, had been selected by lower-level staff." *Brian T.D.*, 580 F. Supp. 3d at 621 (citing *Carr v. Saul*, 141 S. Ct. 1352, 1357 (2021).

The Commissioner argues Ms. Berryhill appropriately resumed the role of Acting Commissioner upon President Trump's nomination of Mr. Saul and rightfully ratified and approved the appointment of all ALJs while serving in that role. [ECF No. 17 at 21]. She submits that most courts that have addressed the issue have concluded the FVRA permitted Ms. Berryhill to resume service as Acting Commissioner upon Mr. Saul's nomination, rendering valid her ratification of the ALJs' appointments. *Id.* at 21–25. She contends this interpretation is also supported by the legislative history, the text, and views of the executive and legislative branches. *Id.* at 25–29. She claims that even if Ms. Berryhill lacked authority to appoint the ALJ, the ALJ's appointment should be upheld by application of the rule of necessity or the de facto officer doctrine. *Id.* at 31. She notes that if the court were to accept Plaintiff's argument, it would lead to pointless "do-over" hearings at the expense of an already-strained systems and those claimants waiting for hearings. *Id.* at 31–32.

In *National Labor Relations Board v. Newark Electric Corporation*, 14 F.4th 153, 160 (2d Cir. 2021), the court explained:

> Section 3348 provides broadly that "[a]n action taken by any person who is not acting under section 3345, 3346, or 3347 . . . in the performance of any function or duty of a vacant office . . . shall have no force or effect." *Id.* § 3348(d)(1). Additionally, it establishes that "[a]n action that has no force or effect . . . may not be ratified. *Id.* § 3348(d)(2). In other words, under section 3348, if an official who is exercising the duties of a vacant office in an acting capacity does not meet the requirements of sections

3345, 3346, or 3347, then that official's actions have no force or effect and cannot be ratified.

The tenure of an individual's service in an acting officer role is subject to the following limitations:

> Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—
>
> > (1)    for no longer than 210 days beginning on the date the vacancy occurs; or
> >
> > (2)    subject to subsection (b),[5] once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346(a). "For vacancies existing during the first 60 days after a Presidential transition (as occurred in 2017), the 210-day period runs from the later of 90 days after inauguration to 90 days after the date of the

---

[5] Section 3346(b) provides:

> (1)    If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.
>
> (2)    Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—
>
> > (a)    until the second nomination is confirmed; or
> >
> > (b)    for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

vacancy." *Williams v. Kijakazi*, C/A No. 1:21-141-GCM, 2022 WL 2163008, at *2 (W.D.N.C. June 15, 2022).

Plaintiff argues Mort Rosenberg's report to Congress entitled "*Congressional Research Service Report for Congress, The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative*" (1998) ("Rosenberg Report") supports her argument, as it states "if the President submits no nomination for an office during the 210-day period from the date of the commencement of a vacancy, the options available under the Act can no longer be utilized." [ECF No. 15 at 29]. She notes the Supreme Court relied extensively on the Rosenberg Report in construing the FVRA's terms in *SW General, Inc. Id.* Although Plaintiff is correct that the Supreme Court cited to the Rosenberg Report in *SW General, Inc.*, it did so in reciting the history leading to replacement of the Vacancies Act with the FVRA—not in interpreting the FVRA. *See SW General, Inc.*, 580 U.S. at 295, 307. Therefore, the cited language in the Rosenberg Report lacks persuasive authority.

Plaintiff cites *Brian T.D.*, as supporting her argument. In *Brian T.D*, the court held the plain language of § 3346(a)(2) did not allow Ms. Berryhill to resume the role of Acting Commissioner because she was not serving as Acting Commissioner when President Trump nominated Mr. Saul. The court wrote:

> "Subsection (b)(1) states that if a nomination is rejected, withdrawn, or returned, "the person may *continue to serve as* the acting officer for no more than 210 days." *Id.* (citing 5 U.S.C. § 3346(b)(1) . . . . Subsection (b)(2) states that if a second nomination is unsuccessful, "the person serving as the acting officer may *continue to serve.*" *Id.* § 3346(b)(2) . . . . The plain language of § 3346(a)(2) means that it only applies to a person presently serving as Acting Commissioner if at the time of nomination, someone "is performing the functions and duties" in accordance with the FVRA. There is no good reason for construing the word "serving" when used in the first paragraph of § 3346(a) differently than when it is used in § 3346(b).

*Id.* at 629–30 (emphasis in original). The court further explained: "A person serving as an acting officer may do so 'for no longer than 210 days beginning on the date the vacancy occurs; *or* . . . once a first or second nomination for the office is submitted to the Senate,' during the pendency of that nomination." *Id.* (emphasis in original) (citing 5 U.S.C. § 3346(a). It found use of the word "or" was disjunctive, "serv[ing] to provide an alternative *length* of service not to create a series of non-contiguous periods of service." *Id.* at *13 (emphasis in original). It further explained: "If the statute were read to create three distinct periods of services—the initial 210 days, the first nominee period, and the second nominee period—the statute would have used the word "and" to separate the three periods of service." *Id.* It again noted use of "is performing" in § 3348(b)(1) suggested the office should remain vacant unless someone was already performing duties. *Id.* The court acknowledged it had reached a conclusion contrary to that of most courts to have considered the issue prior to it, but considered the statutory language of § 3346

controlling and the other cases to contain conclusory analyses. *See id.* at *13–15.

District courts within the Fourth Circuit have rejected the reasoning in *Brian T.D.* and concluded Ms. Berryhill was validly serving as Acting Commissioner pursuant to § 3346 when she ratified the ALJ appointments. *See Coe v. Kijakazi*, C/A No. 5:22-226-KDW, 2023 WL 554119, at *12–13 (D.S.C. Jan. 27, 2023); *Smoak v. Kijakazi*, 2022 WL 4590584, at *3 (W.D.N.C. Sept. 29, 2022); *Taylor v. Kijakazi*, 2022 WL 4668273 (M.D.N.C. Aug. 2, 2022); *Black v. Kijakazi*, 2022 WL 2977340, at *3 (W.D.N.C. July 27, 2022); *Brooks*, 2022 WL 2834345; *Lance M. v. Kijakazi*, C/A No. 2:21-628, 2022 WL 3009122, at *13 (E.D. Va. July 13, 2022), adopted by 2022 WL 3007588 (July 28, 2022); *Williams*, 2022 WL 2163008; *Early v. Kijakazi*, C/A No. 5:21-96-KDB, 2022 WL 2057467 (W.D.N.C. June 7, 2022), *appeal docketed*, No. 22-1797 (4th Cir. July 26, 2022).

In *Brooks*, 2022 WL 2834345, at *16, the court explained:

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985); however, in construing the text of the FVRA, *Brian T.D.* misconstrues Congress's use of the present tense verb "serving" in Section 3346(a)(1), *Brian T.D.*, --- F. Supp. 3d at ---, 2022 WL 179540, at *11. In that regard the court noted that "Congress in enacting § 3346, used the present participle 'serving,' rather than the past or present perfect 'served' or 'has served,'" and thus that "Section 3346(a) . . . applies to the person presently serving in that capacity and not to

a person who had previously served as Acting Commissioner. *Id.* (emphasis added).

That argument, however, glosses over the fact that using "the past or present perfect 'served or 'has served' to set out the time limits for acting officials under the FVRA would not make sense. Had Congress drafted Section 3346(a) to provide that "the person [who served or has served] as an acting officer as described under section 3345 may serve in the office for no longer than 210 days," 5 U.S.C. § 3346(a)(1) (dashes and numbering omitted), the Section, by its terms, would provide service time limits only for individuals who had already served as acting officers, which renders the time limits nonsensical. *See United States v. Turkette*, 452 U.S. 576, 580, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) (holding that, in construing statutory language, "absurd results are to be avoided"); *see also Sorrells v. United States*, 287 U.S. 435, 447, 53 S. Ct. 210, 77 L. Ed. 413 (1932) ("All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to . . . an absurd consequence."); *Harris v. United States*, 215 F.2d 69, 75 (4th Cir. 1954) (holding that "interpretation of a statute leading to absurd . . . results is to be avoided). Construing the phrase "the person serving as an acting officer" as merely descriptive, i.e., explaining that the time limits apply to acting officers under Section 3345 of the FVRA as opposed to acting officers under other, office-specific vacancy statutes, constitutes a more straightforward and common sense interpretation of Section 3346(a).

It further noted that limiting application to the person presently serving in an acting capacity would create a conflict with § 3345, as it would bar the President from designating an alternative acting official if the first assistant had already assumed the acting role through the default operation of the statute. *Id.* at 17. After comparing the language in § 3346(b)(1) and (2), it found the word "serving" did not "possess the talismanic significance the *Brian T.D.* court would like to assign it." The court wrote:

> In subsection (b)(1), the language "the person serving as the acting officer" does not exist; rather, that section merely provides that, if the first nomination for the office fails, "the <u>person</u> may continue to serve as the acting officer for no more than 210 days." 5. U.S.C. § 3346(b)(2) (emphasis added). Despite the difference in language, i.e., "person" in subsection (b)(1), 5 U.S.C. § 3346(b)(1), and "person <u>serving</u> as the acting officer" in subsection (b)(2) (emphasis added), both subsections apply to the <u>same</u> type of individual—the person already serving in the role of an acting officer by virtue of a nomination for the office to the Senate, <u>see</u> 5 U.S.C. § 3346(b).

*Id.* at *18 (emphasis in original).

The court in *Brooks* rejected the court's interpretation of § 3348 in *Brian T.D.*, explaining "[s]ection 3348(b)(1) explicitly ties the "remain vacant provision" to the phrase "performing the functions and duties in accordance with sections 3345, 3346, and 3347," 5 U.S.C. § 3348(b)(1) (emphasis added), and, because Berryhill immediately resumed performing the duties of the office in an acting capacity upon Saul's nomination in accordance with § 3346(a)(2) (as well as § 3345(a)), § 3348(b)(1) did not require the office to 'remain vacant.'" *Id.*

It further rejected the *Brian T.D.* court's interpretation of the meaning of the word "or" in § 3346, accepting the Commissioner's argument and other courts' interpretations that the word "or" has "an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)" and noting "[t]he meaning of 'or' is usually inclusive." *Id.* at *19 (quoting *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015); *Tex. Std. Oil Co. v. Forest Oil Corp.*, C/A No.

05-490, 2008 WL 11399510, at *4 (S.D. Tex. Jan. 2, 2008). It wrote: "Here, the word 'or' appears in a permissive sentence, i.e., 'person serving as an acting officer as described under section 3345 <u>may serve</u> in the office,' 5 U.S.C. § 3346(a) (emphasis added), without qualifiers such as 'either' and 'but not both,' *see id.*" *Id.* (emphasis in original). It explained that the legislative history of the FVRA made it "clear that Congress intended 'or' in its inclusive sense, and that Section 3346(a)(2) constitutes a second, permissible period of service for Berryhill." *Id.* at 20.

Finally, the court in *Brooks* noted the Department of Justice, the Government Accountability Office, and courts interpreting § 3346 outside the Social Security context, had interpreted it to incorporate a spring-back provision whereby the person who had completed the 210-day period of service as the acting official could spring back into the role upon nomination of the permanent official. *Id.* at 21–23.

In *Lance M.*, 2022 WL 3009122, another court within the Fourth Circuit rejected the holding in *Brian T.D.* based on its misinterpretation of "serving" and its finding that the section applied to the person "presently serving" in the capacity as Acting Commissioner. It explained: "[T]he word 'presently' does not appear in the full provision, which refers to 'the person serving as an acting officer <u>as described under Section 3345</u> . . . .' 5 U.S.C. 3346(a)" (emphasis in original). It further noted: "When this qualifying clause

is properly considered, the prefatory language has nothing to do with a period of 'present service.' Instead, it constrains section 3346(a)'s scope to individuals whose authority stems from the FRVA. This prevents section 3346(a)'s timing limitations from unintentionally applying to other vacancy statutes." *Id.*

In another recent case outside the Fourth Circuit, the court rejected the *Brian T.D.* court's reliance on the word "serving" in § 3346, explaining:

> Subsection (a) refers to "the person serving as an acting officer as described in section 3345." Thus, "serving" is used to refer back to section 3345, which sets out who may serve as an acting officer (first assistants or certain other people directed by the President). While § 3345 provides who may serve as an acting officer, § 3346 sets the periods of time during which such persons may serve in that role. Significantly, the active verb in § 3346(a) is not serving, but "may serve": "the person . . . may serve" subject to the time limits set out in subsections (a)(1) and (a)(2). By using "may serve," Congress did not convey that the person had to be currently serving for the nomination rule in subsection (a)(2) to apply ("the person . . . may serve . . . once a . . . nomination . . . is submitted . . . from the date of such nomination for the period that the nomination is pending), Indeed, "serving" is used in subsection (a) generally (not (a)(2) specifically), and the District of Minnesota's reasoning would apply with equal force to subsection (a)(1). If the use of "serving" in subsection (a) means the person must be currently serving at the time of the nomination ("the person serving . . . from the date of such nomination"), it also means that the person must be currently serving at the time of the vacancy ("the person serving . . . on the date the vacancy occurs"). This makes no sense.

*Bauer v. Kijakazi*, C/A No. 21-2008-KEM, 2022 WL 29118917, at *5 (N.D. Iowa July 25, 2022).

The court further rejected the *Brian T.D.* court's reliance on the word

"or" as mutually exclusive, noting:

> Congress did not qualify the use of "or" with "either," which tends
> to indicate that the alternatives are mutually exclusive. In
> addition, if subsections (a)(1) and (a)(2) were mutually exclusive,
> a person could either serve for the initial 210 days, or they could
> serve during the pendency of a nomination, but not both. But no
> court disputes that a person can serve both from the initial 210
> days and while a nomination is pending; rather, *Brian T.D.* and
> *Richard J.M.*[6] held that a person can serve during the pendency
> of a nomination under subsection (a)(2) only if they were
> currently serving the initial 210-day term under section (a)(1).
> This reads language into the statute that does not exist (even
> when "or" is construed as an exclusive disjunction).

*Id.* at *7.

It also noted:

> The Senate Committee report from July 1998 makes clear that
> an "acting officer may serve even if the nomination is submitted
> after the [210] days has passed although . . . the acting officer
> may not serve between the [210th] day and the day the
> nomination is submitted." The language of the proposed § 3346(a)
> discussed in the committee report is the same as the language
> that was ultimately adopted (other than changing 150 days to
> 210 days).

*Id.* at *8.

Given the foregoing explanations, the court joins others in the Fourth

Circuit and rejects Plaintiff's argument. Section 3346(a) of the FVRA

permitted Ms. Berryhill to spring back into the position of Acting

---

[6] The court is referencing *Richard J.M. v. Kijakazi*, C/A No. 19-827 (KMM),
2022 WL 959914 (D. Minn. Mar. 30, 2022), *appeal docketed*, No. 22-2127 (8th
Cir. May 27, 2022), another case in which the District of Minnesota applied
the same reasoning as in *Brian T.D.*

Commissioner once President Trump nominated Andrew Saul as Commissioner based on the provision in paragraph (a)(2). Because Ms. Berryhill was validly serving as Acting Commissioner when she ratified the ALJ's appointment, the ALJ's appointment was also valid, and she had the authority to render a decision in Plaintiff's case.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

March 7, 2023                           Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge